John Jeffrey Eichmann (Cal. Bar No. 227472)
jeichmann@eichmann.com
**EICHMANN, a professional corp.**
225 Arizona Avenue, Suite 300
Santa Monica, California 90401
Tel: (310) 237-9190

Jaime W. Marquart (Cal. Bar No. 200344)
jmarquart@waymakerlaw.com
Ryan G. Baker (Cal. Bar No. 214036)
rbaker@waymakerlaw.com
Donald R. Pepperman (Cal. Bar No. 109809)
dpepperman@waymakerlaw.com
**WAYMAKER LLP**
515 S. Flower Street, Suite 3500
Los Angeles, California 90071
Tel: (424) 652-7800

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| Fanimal, Inc., <br><br> *Plaintiff,* <br><br> v. <br><br> Live Nation Entertainment, Inc., and Ticketmaster LLC, <br><br> *Defendants.* | Case No. 25-12335 <br><br> **COMPLAINT** <br><br> **Jury Trial Demanded** |

# Table of Contents

INTRODUCTION .................................................................................................................1

PARTIES ............................................................................................................................2

JURISDICTION AND VENUE ........................................................................................2

THE RELEVANT MARKETS AND DEFENDANTS' MONOPOLIES ................2

    A.    Primary and Secondary Ticketing................................................................2

    B.    Concert Promotion .......................................................................................4

DEFENDANTS' ANTICOMPETITIVE PRACTICES .................................................4

    A.    Long-term exclusive dealing with venues ..................................................4

    B.    Tying arrangements......................................................................................5

    C.    Coercion and threats against disloyal customers and others ................6

    D.    Leveraging ....................................................................................................8

    E.    Concerted refusals to deal and group boycotts .....................................10

FANIMAL'S ANTITRUST INJURY AND STANDING...........................................10

CLAIMS FOR RELIEF ...................................................................................................12

    Count 1: Violation of Sherman Act § 2 (Monopolization) ...........................12

    Count 2: Violation of Sherman Act § 2 (Attempted Monopolization) .........14

    Count 3: Violation of Sherman Act § 1 (Unlawful Agreements) .................15

PRAYER FOR RELIEF ..................................................................................................16

DEMAND FOR JURY TRIAL ......................................................................................16

# INTRODUCTION

1. Each year, Ticketmaster sells hundreds of millions of tickets for music concerts and other live events. No competitor comes close. Ticketmaster did not earn its dominance through innovation, quality, low prices, or customer service. Ticketmaster is not known for those things; it is known for website crashes and insecure architecture, high prices and hidden fees, and poor customer service. Ticketmaster dominates the ticketing market because it created an unlawful monopoly that it continues to maintain with the help of another monopolist, its corporate parent Live Nation. Defendants' monopolies have harmed fans, artists, and venues. And they have eliminated competition from challengers like Fanimal.

2. Fanimal was an innovative ticketing start-up focused on fans. It had venture capital backing, a fast-growing user base of more than 250,000, and a projected valuation of more than $100 million within just a few years. But Fanimal fell prey to Defendants' anticompetitive practices and was forced to shutter its ticketing business and sell its parts.

3. Federal and state agencies, and classes of consumers, have filed suit against Defendants for their anticompetitive conduct.[1] But those cases cannot help Fanimal, which has been forced out of business irrevocably. Fanimal brings this case to hold Defendants accountable and to recover for Fanimal's founders and shareholders.

---

[1] *Heckman v. Live Nation* is a class action pending in this district in which the same anticompetitive conduct alleged in this case is alleged by the class against Live Nation and Ticketmaster. *Heckman v. Live Nation Ent., Inc.*, No. CV 22-0047-GW-GJSX, 2025 WL 1141266, at *1 (C.D. Cal. Apr. 11, 2025) (describing allegations and denying motion to dismiss); *id.*, Docket No. 1 (Complaint filed Jan. 4, 2022), Docket No. 528 (Order granting class certification, entered Dec. 12, 2025). The U.S. Department of Justice also asserts the same allegations of anticompetitive practices that Plaintiff asserts in a pending action in the Southern District of New York. *United States v. Live Nation Ent., Inc.*, No. 24-CV-3973 (AS), 2025 WL 835961, at *2 (S.D.N.Y. Mar. 14, 2025) (denying motion to dismiss); *id.* Docket No. 257 (Amended Complaint filed Aug 30, 2024).

## PARTIES

4. Ticketmaster LLC ("Ticketmaster") is a Virginia limited liability company based in Beverly Hills, California. Ticketmaster is the largest ticketing company in the United States and globally. It sells tickets in the primary and secondary ticketing markets, as described below.

5. Live Nation Entertainment, Inc. ("Live Nation") is a Delaware corporation, also based in Beverly Hills. Live Nation is the world's largest live entertainment company. It promotes concerts and other live events, manages artists, and owns and operates venues. Live Nation also owns Ticketmaster.

6. Fanimal, Inc. ("Fanimal") is a Delaware corporation that was based in Santa Monica, California. Before ceasing operations in late 2024, Fanimal participated in and sold tickets in the primary and secondary ticketing markets.

## JURISDICTION AND VENUE

7. Fanimal brings suit against Defendants for violating Sections 1 and 2 of the Sherman Act. 15 U.S.C. §§ 1, 2. This Court has exclusive subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §§ 1331 and 1337.

8. This Court has personal jurisdiction over Defendants because they transact business in this district and are also headquartered here.

9. Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendants reside in this district and sell tickets in and from this district.

## THE RELEVANT MARKETS AND DEFENDANTS' MONOPOLIES

**A.   Primary and Secondary Ticketing**

<u>Primary Ticketing Market</u>

10. A major concert venue for live music or comedy shows, like the Greek Theatre or the Hollywood Palladium, contracts with successful, nationally known artists to host their shows. The venue also contracts with ticketing services to hold the ticketing inventory and sell tickets to the public. The initial sale of a ticket supplied by the venue is a sale in the "primary ticketing market." This is a

national market that covers the entire United States. Ticketmaster holds a monopoly in this market. It controls the ticketing for roughly 80% of major venues across the country and sells about 75% of all online concert tickets through websites and other platforms under its control. Through its market dominance, Ticketmaster also obtains and exploits its exclusive access to vast quantities of proprietary data on consumer demand, pricing sensitivity, attendance patterns, resale behavior, and artist performance across venues and tours.

11. The cross-elasticity between primary ticketing services for concerts and other forms of services is extremely low and there are no reasonable substitutes. Entry barriers to this relevant market are high. Competition for contracts at other types of venues (i.e., venues that are not major concert venues) does not defeat Ticketmaster's monopoly or otherwise constrain pricing or conduct in the primary ticketing market. Major concert venues account for a disproportionate share of concert revenue, and nationally known artists and performers cannot substitute their appearances at such venues in response to supracompetitive pricing or restrictive conduct. Additionally, the network effects created by Ticketmaster's immense venue and ticketing customer base operate as a high barrier to competitive entry to the market and further entrench Ticketmaster's market power.

Secondary Ticketing Market

12. The "secondary ticketing market" is where tickets are resold, typically through an online platform provided by a ticketing service. This is also a national market. Ticketmaster sells a large and increasing percentage of the tickets to live music events at major venues that are sold in the secondary market through its TM+ and 3PE services. Ticketmaster uses its monopoly in the primary ticketing market to hold and grow its substantial position in the secondary ticketing market. This includes Ticketmaster's use of its SafeTix technology, which requires the transfer of tickets within the Ticketmaster platform.

### B. Concert Promotion

13. The promoter of a concert is responsible for organizing and marketing the concert. This typically includes hiring the artist (often with multimillion-dollar guarantees for top acts), securing a venue (either via rental or its own properties), arranging local production services, and overseeing advertising and promotion. This is a national market, as major artists hire promoters in the U.S. to promote their U.S. shows.

14. Live Nation holds a monopoly in the concert promotion market. It manages over 400 musical artists, including the vast majority of the most successful touring artists. It controls around 60% of concert promotions at major U.S. venues. And it owns or operates about 150 music venues in the U.S., including more than 60 of the top amphitheaters in the country—far more than any competitor.

## DEFENDANTS' ANTICOMPETITIVE PRACTICES

15. Defendants have not acquired or maintained their monopolies through legitimate competitive practices, innovation, or superior services or pricing. They have instead done so through various anticompetitive practices, with the purpose and effect of foreclosing rivals from the primary and secondary ticketing markets, restricting access to venues, and blocking competing resale platforms.

### A. Long-term exclusive dealing with venues

16. Defendants have used Live Nation's monopoly power in the promotion services market to force major concert venue operators to enter into long-term exclusive dealing arrangements with Ticketmaster, with respect to the provision of primary and secondary ticketing services. Ticketmaster has long-term exclusive agreements with at least 70% of the major concert venues in the United States for primary ticketing services—more than 12,000 venues. Those exclusive agreements are typically for five to seven year terms (but some are for more than ten years), and are secured by Ticketmaster's payment of subsidies and up-front

incentives that aim to foreclose competitors from fairly competing for ticketing at those venues. Those agreements include substantial penalties if venues attempt to terminate the agreement early, or if venues attempt to work with a different ticketing provider. This embedded base of exclusionary written agreements acts as a barrier to market entry and precludes meaningful competition.

17. Ticketmaster did not secure those exclusive dealing agreements through fair competition. Instead, Defendants wielded their access to top touring acts and their concert promotion services to pressure venues into long-term relationships with Ticketmaster. In some instances, these agreements are in effect evergreen.

18. These exclusive dealing arrangements have had the effect of foreclosing competition in a substantial share of the line of commerce affected and the relevant market for primary and secondary ticketing services for major concert venues. As a result of Defendants' exclusive dealing agreements, other providers of ticketing services are unable to compete in those markets, and Defendants are able to maintain monopoly power in the market for primary ticketing services.

### B. Tying arrangements

19. Defendants leverage Live Nation's market power in the market for concert promotion services to force venues to use Ticketmaster's primary ticketing services. Venues depend on concert promotion and access to major touring artists to fill their seats and generate revenue.

20. If a venue wants to take advantage of Live Nation's concert promotion services, Live Nation requires that the venue use Ticketmaster's primary ticketing services. And because major concert venues depend on concert promotion and major artists, the concert venues relent and agree to use Ticketmaster for their primary ticketing services. Thus, Defendants condition the provision of Live Nation's concert promotion services on the use of Ticketmaster's primary ticketing services.

21.     Live Nation's economic power in the market for concert promotion services is sufficient to allow Live Nation to restrain trade in the market for primary ticketing services.  Indeed, Live Nation's market power is evidenced by its ability to operate its concert promotion services business as a loss leader.  Live Nation can overpay artists to prevent competitive promoters from accessing those artists, because it will make back those losses through Ticketmaster's supracompetitive profits.  For example, in 2019, Live Nation's promotion business lost $53 million, while Ticketmaster generated over $230 million in operating income.

22.     Because of Live Nation's dominant control of the concert promotion services market, it can force venues into agreeing to use Ticketmaster for the provision of primary ticketing services, even though venues may prefer to use one of Ticketmaster's competitors.  Defendants' conduct has had anticompetitive effects in the market for primary ticketing services (including reduced competition, loss of consumer choice, and supracompetitive pricing), and it has affected a not insubstantial amount of interstate commerce in the provision of primary ticketing services.

### C.     Coercion and threats against disloyal customers and others

23.     In addition to the long-term exclusive dealing agreements and tying practices, Defendants also threaten reprisals against concert venues that consider working with other providers of ticketing services (like Fanimal) in the primary or secondary ticketing markets.  If a venue selects an alternative to Ticketmaster, it risks losing out on Live Nation's substantial portfolio of artists and promotional resources.  And as a result, Live Nation can extract favorable promotion terms and force venues into exclusive agreements with Ticketmaster.

24.     As Live Nation's CEO explained: "We can't say to a Ticketmaster venue that says they want to use a different ticketing platform, 'If you do that, we won't put shows in your building.' … [But] we have to put the show where we

make the most economics, and maybe that venue [that wants to use a different ticketing platform] won't be the best economic place anymore because we don't hold the revenue."[2]  Live Nation's retaliatory measures are not limited to pulling concerts entirely.  It can (and has) reduced the number of events booked, shifted shows to less profitable dates, scaled back promotional support, or required venues to disable secondary ticketing on competing platforms—discouraging fans from purchasing in the first place and frustrating those who need to resell tickets.  This coercive playbook has been deployed repeatedly in recent years.

25.     For example, in 2021, Live Nation targeted a venue that had chosen SeatGeek for primary ticketing, in part because SeatGeek offered a higher share of secondary ticketing fees.[3]  When the venue proceeded with SeatGeek, Live Nation diverted concerts to other locations and insisted that secondary ticketing on SeatGeek be disabled for Live Nation-promoted events.

26.     Incidents like this one are part of Live Nation's pattern of retaliation against venues that opt not to sign with Ticketmaster.  Indeed, AEG, the second-largest primary ticketing services provider, has reported to the Department of Justice that venues that it managed were told that they would lose valuable shows if Ticketmaster was not used as a vendor.  In multiple other instances, Live Nation has informed venues that they were on "the black list" for choosing to contract with Ticketmaster competitors and has withheld concerts and bookings from venues that opt to contract with a Ticketmaster competitor.

27.     These types of threats are anticompetitive and have no procompetitive justification.  They are designed to force venues to continue to remain in the Live Nation-Ticketmaster ecosystem, and to foreclose competitors from fairly competing in the market for primary ticketing services provided to those venues.

---

[2] https://variety.com/2019/biz/news/live-nation-ticketmaster-michael-rapino-dept-of-justice-inquiries-1203341144/
[3] https://www.justice.gov/atr/media/1353101/dl

7
Complaint

Those threats have been highly successful—Ticketmaster boasts a renewal rate nearing 100% for its long-term contracts, and no competitor has been able to meaningfully compete with the Ticketmaster-Live Nation ecosystem.

### D. Leveraging

28. Defendants utilize their market power in the primary ticketing services market for major concert venues and the market for concert promotion services for major concert venues to attempt to monopolize the market for secondary ticketing services.

29. Defendants use their monopoly power in the market for concert promotion services to force venues into long term exclusive agreements with Ticketmaster in the primary ticketing market. And Defendants further threaten reprisals against venues that don't cooperate.

30. Moreover, Defendants also leverage their monopoly in the primary ticketing market to attempt to monopolize the secondary ticketing market, including through the coercion of ticket brokers and imposition of technological restrictions on ticket transfers.

31. It has historically been easy for primary ticket purchasers to transfer electronic tickets—either by uploading their ticket to a secondary ticketing platform of the reseller's choice, or by sending that ticket directly to a secondary purchaser. A competitive marketplace for secondary ticketing requires a free-flowing supply of primary tickets, in which the reseller can select the most favorable secondary marketplace based on fees, ease of use, and other factors. But Ticketmaster has leveraged its market power in the primary ticketing services market to prevent these types of easy transfers of tickets and to preclude secondary ticketing services from competing.

32. Ticketmaster uses a "conditional license" to restrict transfers of tickets bought on Ticketmaster's primary ticket market. Users are permitted to use Ticketmaster's site only if they agree to restrictions that bar purchasing tickets

from Ticketmaster and reselling those tickets on other, non-Ticketmaster secondary ticketing platforms.  Ticketmaster claims that these restrictions are meant to combat ticket brokers and resellers.  But in reality, Ticketmaster's conditional license is a tool to coerce brokers into using Ticketmaster's secondary reselling platform.  Ticketmaster allocates a set number of primary tickets to ticket brokers.  But Ticketmaster requires that brokers agree to only resell their tickets on Ticketmaster's secondary market.  If brokers don't agree, Ticketmaster uses the conditional license to try to block the ticket brokers from Ticketmaster's platform.  Because of Ticketmaster's monopoly in the primary ticketing market, brokers relent and agree.

33. Ticketmaster also uses technological restrictions to force users into its secondary ticketing platform.  As electronic tickets (through QR codes on mobile devices) have become more popular, Ticketmaster has implemented limits on the transferability of those electronic tickets.  Ticketmaster's "SafeTix" technology makes tickets only available on Ticketmaster's smartphone application, refreshes the barcode for the ticket automatically, and restricts the transferability of those tickets.  This prevents purchasers of tickets from Ticketmaster in the primary ticketing market from reselling those tickets on other secondary ticketing platforms.

34. As a result of these predatory and anticompetitive practices, Ticketmaster is able to force users into its secondary ticketing marketplace where it can extract supracompetitive secondary ticketing fees on repeated sales of tickets.  Indeed, the secondary ticketing fees charged by Ticketmaster to resellers on its platform are either the same or higher than competitors' fees, and the fees Ticketmaster charges to purchasers are higher than those charged by competitors.  This supracompetitive pricing, unrelated to the quality of the service offered, demonstrates Ticketmaster's ability to prevent fair competition in the secondary

ticketing marketplace by leveraging its monopoly power in the primary ticketing marketplace.

### E. Concerted refusals to deal and group boycotts

35. Defendants consistently induce and coerce venues to boycott Ticketmaster's competitors for the provision of primary ticketing services. Through use of the exclusive dealing and tying arrangements discussed above, Defendants ensure that venues boycott competitive providers of primary ticketing services. Moreover, when venues consider reneging on that boycott, Live Nation threatens the venue with retribution, including by no longer booking tours at that venue. That conduct forecloses access to the relevant market for primary ticketing services for major concert venues and prevents competitors from effectively entering and competing in that market.

36. Moreover, Defendants also induce ticket brokers and ticket purchasers to boycott Ticketmaster's competitors for the provision of secondary ticketing services. Ticketmaster coerces brokers into using its secondary ticketing platform by threatening to no longer provide brokers with allocated tickets if they choose to use a different platform. And Ticketmaster utilizes technological restrictions to force purchasers of tickets on Ticketmaster's primary ticket market to resell those tickets on Ticketmaster's secondary ticket market, rather than a competitor's. This conduct forecloses meaningful access to the relevant market for secondary ticketing services and prevents competitors from entering and competing in that marketplace. It also restricts consumer choice and extracts price premiums that are untethered to the quality of the service offered.

### **FANIMAL'S ANTITRUST INJURY AND STANDING**

37. Fanimal has the requisite antitrust standing because it has been injured in its "business or property." Section 4 of the Clayton Act (15 U.S.C. § 15).

38. Fanimal was founded in 2018 with the purpose of providing ticketing services focused on the fan experience and transparent pricing, with no hidden

fees. Fanimal operated in both the primary ticketing market and the secondary ticketing market, providing ticketing services for music events, comedy shows, and other live events. Fanimal's platform and app offered unique benefits by allowing users to split payments and invite friends, and made it easier for event organizers to easily purchase large ticket volumes for their groups. Fanimal filed for and obtained patents, had full-time employees and field support, and raised $9.5 million in capital from blue-chip firms famous for investing in companies like DoorDash, Dropbox, FanDuel, Toast, Google, and Facebook. Fanimal was an active participant in both markets and was well-liked by fans and concertgoers, especially in its hometown of Los Angeles and at popular venues like The Penmar in Venice. Fanimal had a Trustpilot score of 4.9/5, in contrast to Ticketmaster's score of 1.7/5, and achieved a nearly 100% organizer retention rate (earned by Fanimal's performance, not threats). Fanimal's online platform was well-designed and engineered, tested, and designed to scale to venues of all sizes.

39. Fanimal was ready and able to provide ticketing services for major concert venues of all sizes and competed for and obtained contracts with such venues. Consistent and growing access to major concert venues was necessary for Fanimal to achieve and maintain the minimum efficient scale required to compete effectively in the primary ticketing services market, to attract additional capital and investment, and to spread fixed technology and operational costs across a sufficient transaction volume. But Defendants' illegal, anticompetitive, and predatory conduct harmed competition in the relevant markets and foreclosed Fanimal from gaining further ground with major concert venues, obtaining further funding to go up against Ticketmaster's monopoly and maintain its operations, and further caused Fanimal to lose contract opportunities at major and non-major concert venues, resulting in the shutdown of its operations.

40. Defendants' exclusionary long-term agreements with venues prevented Fanimal from fairly competing for large concert venues and the most lucrative events. Defendants' anticompetitive conduct (including tying, leveraging, threats to venues, and refusals to deal) foreclosed Fanimal from fairly competing in the market for primary and secondary ticketing services. As a result of Defendants' exclusionary practices, Fanimal was forced to shut down operations and sell its assets in late 2024 for a modest amount. Defendants foresaw and intended that their actions in the primary and secondary ticketing markets would eliminate competition (including competitors like Fanimal), thereby causing antitrust injury. This conduct also harms consumer welfare because it reduces consumer choice, raises prices, stifles innovation, and decreases the quality of ticketing services.

41. Fanimal retained the rights to its causes of action against Defendants so it could enforce those rights and obtain recovery for its shareholders and founders who have borne the financial brunt of the harm caused by Defendants.

## CLAIMS FOR RELIEF

### Count 1: Violation of Sherman Act § 2 (Monopolization)
(Against both Defendants)

42. Plaintiff repeats and realleges the foregoing allegations of this Complaint.

43. Defendants have willfully acquired and maintained monopoly power for Ticketmaster in the primary ticketing services market. Defendants have also willfully acquired and maintained monopoly power for Live Nation in the concert promotion services market.

44. Ticketmaster has monopoly or market power in the primary ticketing market. Ticketmaster has a market share exceeding 75% in this market—both for direct sales at venues and for online sales of tickets.

1    45.     Live Nation has monopoly or market power in the concert promotion market. Live Nation controls around 60% of concert promotion at major concert venues and manages the vast majority of the most successful touring artists.

46.     Defendants willfully acquired and maintained monopoly power for Ticketmaster in the relevant primary ticketing market by means of predatory, exclusionary, and anticompetitive conduct. That conduct includes, but is not limited to, leveraging its monopoly power in the primary ticketing market to monopolize or attempt to monopolize the secondary market, coercion of disloyal customers and others, tying arrangements, long-term exclusive dealing arrangements, and concerted refusals to deal and group boycotts. That conduct has had an anticompetitive effect in the market for primary ticketing services for major concert venues, as well as in the market for secondary ticketing services for major concert venues. And Defendants' conduct does not have any procompetitive effect or legitimate business purpose.

47.     Defendants' conduct has taken place in and had a substantial effect on interstate commerce in the United States. Defendants have provided primary and secondary ticketing services for major concert venues located throughout the United States. And Defendants have used instrumentalities of interstate commerce to provide primary and secondary ticketing services throughout the United States. Defendants' supracompetitive pricing and anticompetitive actions have affected billions of dollars of commerce in the United States.

48.     Fanimal was injured by Defendants' unlawful conduct. Fanimal was prevented from fairly competing in the markets for primary ticketing services and secondary ticketing services. That injury is the type that the antitrust laws were intended to prevent, because it stems from the harm that Defendants' actions have caused to competition in the relevant markets. By reason of Defendants' conduct competition in the relevant markets has been restrained and lessened, and consumer welfare has been harmed.

13
Complaint

**Count 2: Violation of Sherman Act § 2 (Attempted Monopolization)**
(Against both Defendants)

49. Plaintiff repeats and realleges the foregoing allegations of this Complaint.

50. Defendant Ticketmaster has a market share exceeding 75% in the market for primary ticketing services. Defendant Live Nation has a greater than 60% market share in the market for concert promotion services at major concert venues.

51. Defendants have engaged in anticompetitive and exclusionary conduct with the specific intent of monopolizing the market for secondary ticketing services. That conduct includes, but is not limited to, leveraging, coercion of disloyal customers and others, tying arrangements, long-term exclusive dealing arrangements, concerted refusals to deal and group boycotts.

52. Defendants' conduct has had anticompetitive effects in the markets for primary ticketing services and secondary ticketing services.

53. Defendants' conduct has no legitimate business purpose or procompetitive effect.

54. Defendants have engaged in the conduct described above with the specific intent of monopolizing the market for secondary ticketing services.

55. Defendants' conduct has a dangerous probability of achieving monopoly power in the market for secondary ticketing services.

56. Defendants' conduct has had a substantial effect on interstate commerce.

57. Fanimal has been injured as a result of Defendants' anticompetitive conduct and attempted monopolization of the market for secondary ticketing services. Fanimal's injury is of the type that the antitrust laws were intended to prevent. Fanimal was injured by the harm to competition in the market for secondary ticketing services as a result of Defendants' conduct.

**Count 3: Violation of Sherman Act § 1 (Unlawful Agreements)**
(Against both Defendants)

58. Plaintiff repeats and realleges the foregoing allegations of this Complaint.

59. Defendants have induced or coerced venues to enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain monopoly power for Ticketmaster in the market for primary ticketing services and in their attempt to obtain a monopoly for Ticketmaster in the market for secondary ticketing services.

60. Defendants have conditioned the provision of services and access to venues over which they hold market power on the boycotting of competing primary ticketing service providers, including Fanimal, and the use of Ticketmaster's secondary ticketing services.

61. These contracts, combinations, or conspiracies include but are not limited to tying arrangements, long-term exclusive dealing arrangements, concerted refusals to deal, and vertically arranged group boycotts.

62. Defendants' conduct has had an anticompetitive effect in the markets for primary and secondary ticketing services. Defendants possess market power in these relevant markets.

63. Defendants' conduct has no legitimate business purpose or procompetitive effect.

64. There are less restrictive alternatives to the restraints Defendants imposed on the markets for primary and secondary ticketing services.

65. Defendants' conduct has had a substantial effect on interstate commerce.

66. Live Nation intentionally and actively promoted, encouraged, aided, assisted, and/or directed Ticketmaster's conduct alleged above. Live Nation also

1  independently participated in the anticompetitive conduct alleged in this Count.
2       67.   Fanimal has been injured as a result of Defendants' conduct.
3  Fanimal's injury is of the type that the antitrust laws were intended to prevent.
4  Fanimal was injured by the harm to competition in the markets for primary and
5  secondary ticketing services as a result of Defendants' conduct.

## PRAYER FOR RELIEF

Plaintiff requests the following relief: (a) damages in an amount to be determined; (b) treble damages; (c) attorneys' fees; (d) costs; (e) pre-judgment and post-judgment interest at the maximum rate permitted under the law; and (f) such other and further relief as the Court deems proper and just.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Local Rule 38-1, Plaintiff demands a jury trial as to all issues triable by a jury.

Date: December 30, 2025                    Respectfully submitted,

By: */s/ Jeff Eichmann*
John Jeffrey Eichmann
(Cal. Bar No. 227472)
**EICHMANN, a professional corp.**
225 Arizona Avenue, Suite 300
Santa Monica, California 90401
(310) 237-9190 (tel.)
jeichmann@eichmann.com

Jaime W. Marquart
(Cal. Bar No. 200344)
jmarquart@waymakerlaw.com
Ryan G. Baker
(Cal. Bar No. 214036)
rbaker@waymakerlaw.com
Donald R. Pepperman
(Cal. Bar No. 109809)
dpepperman@waymakerlaw.com
**WAYMAKER LLP**

515 S. Flower Street, Suite 3500
Los Angeles, California 90071
(424) 652-7800 (tel.)

*Attorneys for Plaintiff Fanimal, Inc.*